# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**T&M FARMS and P&J FARMS, on behalf
of themselves and others similarly situated,**
        **Plaintiffs,**

        **v.**                                  **Case No. 19-C-0085**

**CNH INDUSTRIAL AMERICA, LLC,**
        **Defendant.**

---

## DECISION AND ORDER

In this action, two cotton farms allege that they purchased cotton-picking machines manufactured by CNH Industrial America, LLC ("CNH"), that failed to perform as expected. They bring claims for breach of implied warranty, breach of the implied covenant of good faith and fair dealing, violation of Wisconsin's Deceptive Trade Practices Act, fraud, and unjust enrichment. Before me now is CNH's motion to dismiss the First Amended Class Action Complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

## I. BACKGROUND

The plaintiffs, T&M Farms and P&J Farms, are cotton farms that have each purchased CNH's "Module Express" cotton picker. T&M Farms is a general partnership; its two partners are citizens of Arkansas. P&J Farms is a general partnership; its four partners are citizens of Alabama. CNH is a Delaware limited liability company headquartered in Racine, Wisconsin. Its sole member is Case New Holland Industrial Inc., a Delaware corporation that is also headquartered in Racine. CNH manufactures agricultural equipment, including the Module Express pickers at issue in this suit.

According to the allegations of the First Amended Class Action Complaint,[1] since the 1940s, farmers have been using three pieces of machinery to harvest cotton: a mechanical picker (which collects the cotton off the plants), a boll buggy (which transfers cotton from the picker to a module builder), and the module builder itself (which compacts the cotton into large, rectangular shapes that maintain structure and can be transferred to a gin for processing). In the late 1990s, the world's two largest manufacturers of agricultural equipment—CNH and John Deere—separately began developing a type of picker that could perform the work of all three machines. Such a machine would pick cotton and then compact it into a module without the need for a buggy and a stand-alone module builder. The cotton industry considered this to be a potentially revolutionary change that would represent a leap in efficiency in cotton farming.

John Deere patented a picker of this type in 1999. The complaint alleges that CNH wanted to beat John Deere to market with its own picker. However, CNH knew that the picker it was developing suffered from "inherent flaws, inadequate quality and process control, insufficient testing and troubleshooting, and manufacturing failures, such that [it] would never operate correctly." Compl. ¶ 38. CNH also knew that attempting to resolve these problems would lead to substantial delay and cause it to lose the competitive advantage it would gain by beating John Deere to market. Thus,

---

[1] In this opinion, all references to the complaint are to the First Amended Class Action Complaint, which is ECF No. 10 on the court's electronic docket. The defendants previously moved to dismiss the original complaint (ECF No. 1), which had been filed by T&M Farms alone. However, the First Amended Class Action Complaint supersedes the original complaint, and thus I will deny the original motion to dismiss as moot.

the complaint alleges, CNH decided to bring its picker to market first, knowing that the picker was "irreparably flawed." *Id.*

In 2006, CNH introduced its new picker, the Case Module Express 625, pricing it at $500,000. The Module Express was designed to pick cotton at more than three miles per hour while at the same time forming the picked cotton into a rectangular module that could be deposited in the field. The cotton was supposed to be packed so tightly that the module would hold together in the field and could be covered with a tarp before being transferred to a gin. Owning a picker that could perform these tasks would allow farmers to trade in their current picker, buggy, and module builder for a single piece of equipment that would accomplish all three tasks more quickly, more efficiently, and with less labor and operating cost than a three-machine operation.

The complaint alleges that CNH, in its marketing materials, represented that "the Module Express was a reliable machine that was powerful and could operate in all conditions, that it would both pick cotton and build consistent, well-formed cotton modules, and that it was the most efficient and profitable way to harvest cotton." Compl. ¶ 45; *see also id.* ¶ 47. These statements originated with CNH's executives at its Racine headquarters and were disseminated to the public through press releases and marketing brochures. *Id.* ¶ 44. The statements were also repeated to customers by CNH's "captive dealers." *Id.*

The complaint alleges that none of CNH's marketing statements were true. Compl. ¶ 45. Instead, the pickers "fail and break down in the field quickly and often, need continual repairs, and are not reliable enough such that farmers can use them throughout a cotton harvest." *Id.* ¶ 50. The Module Express "does not have sufficient

3

power to pick cotton in diverse terrain or weather; it breaks down, bogs down, and elements related to the hydraulic system fail or get stuck." *Id.* Moreover, "[t]he module packing system fails to create consistent, domed, rectangular modules that will hold together and be weatherable." *Id.* Because of these problems, the Module Express does not save farmers time or money. The complaint alleges that CNH knew that its representations about the Module Express were false at the time it made them. *Id.*

In 2012, CNH changed the model number of the Module Express to 635. The complaint alleges that CNH implemented the model-number change not because it updated the picker, but because it hoped to control the "fallout" from the faulty 625 designation through rebranding. *Id.* ¶ 40. The plaintiffs allege that the model 635 suffers from the same defects as the model 625. *See id.* ¶ 12.

The complaint alleges that CNH engaged in a separate scheme to facilitate the resale of "non-functioning, previously owned Module Express pickers" through its "captive dealers." Compl. ¶ 53. Pursuant to this scheme, CNH would take a used, non-functioning picker that one of its dealers accepted through a trade-in and transfer it to a dealer in another part of the country. The dealer at the new location would represent to farmers that the used picker was "operable, in good working order, and capable of picking and bailing cotton." *Id.* ¶ 55. Neither the dealer nor CNH would tell farmers that the used pickers had been subject to multiple repair claims, that CNH had not been able to "adequately fix them," and that they did not operate as represented. *Id.*

The complaint also alleges that, between 2012 and the present, CNH "did not acquire or manufacture sufficient amounts of crucial replacement parts for the Module Express pickers." Compl. ¶ 57. As a result, when a picker broke down, the farmer could

4

not get it repaired quickly enough. This was problematic because cotton farmers often have only 20 days per year to harvest crops. According to the complaint, "CNH knew that it was unable to supply sufficient volumes of replacement parts to keep its Module Express machines operating, but continued to sell Module Express pickers without disclosing this material fact." *Id.* CNH also "prevent[ed] farmers from having access to the manuals and parts necessary to attempt to fix the Module Express pickers outside of the CNH network." *Id.* ¶ 5.

The named plaintiffs in this case allege that they purchased Module Express pickers that failed to live up to their expectations. In 2011, T&M Farms "was induced" to trade in working John Deere equipment and purchase two new Case Module Express 625 pickers. Compl. ¶ 10.[2] However, the two pickers "never performed as promised by CNH." *Id.* They "suffered constant mechanical failures and were never able to efficiently bale cotton into modules." *Id.* Further, "CNH, through its agents and captive dealer, repeatedly represented to T&M Farms that the issues it was experiencing with the 625s could be fixed when, in fact, the pickers were incapable of operating as promised." *Id.* T&M Farms ultimately experienced "years of repeated breakdowns, costly repairs, inability to source replacement parts, and consistent failures in performance and mechanical issues." *Id.* ¶ 11.

---

[2] The complaint does not expressly allege that T&M Farms purchased the new pickers in 2011. However, the defendant argues in its motion to dismiss that it must have purchased them in that year, and T&M Farms concedes in its response brief that it purchased the machines in 2011. *See* Br. in Opp. at 26, ECF No. 13. Thus, for purposes of the motion to dismiss, I will assume that T&M Farms purchased the new pickers in 2011.

5

In approximately April 2016, T&M Farms traded in its two Module Express 625 pickers and purchased a previously owned Module Express 635 picker. Compl. ¶ 11. T&M Farms purchased the previously owned 635 picker "through a captive CNH dealer." *Id.* According to the complaint, the used 635 picker "had incurred previous significant and repeated mechanical failures." *Id.* ¶ 12. Specifically, in just a single harvesting season, the picker broke down more than a half dozen times. T&M farms alleges that neither the dealer nor CNH disclosed this information. When T&M Farms began using the picker, it discovered that the machine suffered from the same problems as the 625 pickers it had traded in. The 635 "suffered from a consistent lack of engine power, repeated failures throughout the hydraulic systems, and a consistent inability to harvest cotton and bale it into modules." *Id.* And when the 635 worked, "it did so far less efficiently than promised by CNH." *Id.* T&M Farms eventually purchased an additional John Deere picker to complete its cotton harvest.

The other plaintiff, P&J Farms, purchased two new Module Express 635 pickers from a CNH dealer in the spring of 2017. Compl. ¶ 13. P&J Farms alleges that, in purchasing the pickers, it "relied upon CNH's representations that the Case Module Express 635 would pick, collect, and build gin-ready modules all in one machine, bringing cost and efficiency savings to its cotton harvest while experiencing less down time and requiring less maintenance." *Id.* P&J Farms paid $425,000 for each picker. *Id.* ¶ 14.

P&J Farms alleges that the Module Express pickers never performed as promised. "They were plagued with problems requiring near constant maintenance, and suffered continuous mechanical failures that CNH was unable to fix—despite its

6

promises to do so—and were never able to efficiently bale cotton into modules, the key distinguishing feature promoted by CNH to justify their purchase." Compl. ¶ 15. P&J Farms also had difficulty finding replacement parts for the pickers. *Id.* ¶17. Because of these problems, P&J Farms was unable to harvest as much cotton as it expected to harvest. *Id.* ¶ 16. After using the Module Express 635 pickers for one season, it decided to sell them and purchase John Deere pickers instead. *Id.* ¶17. P&J Farms alleges that it lost $80,000 on the sale of each picker. P&J Farms also estimates that, due to the poor performance of the Module Express 635, it was unable to harvest $100,000 worth of cotton and was charged a "2 cent per pound grade degradation" on the cotton that the picker was able to harvest. *Id.*

On January 14, 2019, T&M Farms commenced this action on behalf of itself and a class consisting of all purchasers, owners, and lessees of Module Express pickers in the United States. On April 3, 2019, the complaint was amended to add P&J Farms as a plaintiff. The plaintiffs allege five counts against CNH relating to the marketing and sale of the Module Express: (1) violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18; (2) breach of the implied warranty of merchantability; (3) breach of the implied duty of good faith and fair dealing; (4) unjust enrichment; and (5) common-law fraud.

The defendants move to dismiss the amended complaint for failure to state a claim upon which relief can be granted. Before addressing this motion, I will briefly explain the basis for the court's subject-matter jurisdiction.

7

## II. DISCUSSION

### A.    Subject-Matter Jurisdiction

The plaintiffs allege that I may exercise diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). However, at this point, it is unnecessary to consider whether the requirements of the Class Action Fairness Act are satisfied. The plaintiffs are citizens of Alabama and Arkansas, the defendant is a citizen of Delaware and Wisconsin, and each plaintiff alleges a claim against the defendant in which the amount in controversy exceeds $75,000, exclusive of interest and costs. Therefore, traditional diversity jurisdiction exists under 28 U.S.C. § 1332(a).

### B.    Motion to Dismiss

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In construing a plaintiff's complaint, I assume that all factual allegations are true but disregard statements that are conclusory. *Iqbal*, 556 U.S. at 678.

CNH concedes for purposes of the motion to dismiss that Wisconsin law governs all claims. *See* Br. in Supp. at 2 n.1, ECF No. 12. Thus, I apply Wisconsin substantive law in this opinion.

8

### 1. Breach of Implied Warranty of Merchantability—New Pickers

In moving to dismiss the plaintiffs' claims for breach of the implied warranty of merchantability relating to new pickers, CNH does not contend that the complaint fails to plausibly allege that the pickers were not merchantable. Instead, CNH focuses on the express warranty that it claims it made at the time the plaintiffs purchased their pickers. This warranty supposedly disclaims the implied warranty of merchantability and limits the buyer to a repair remedy. The problem with this argument is that the manufacturer's written warranty is not part of the complaint. Instead, CNH attaches what it claims is the written warranty to its motion to dismiss. *See* Exs. 1&2 to Br. in Supp., ECF Nos. 12-1 & 12-2. Under Rule 12(d), a court may not consider matters outside the pleadings on a motion under Rule 12(b)(6) without converting the motion to one for summary judgment. CNH does not ask me to convert the motion to one for summary judgment, and in any event, I would not do so without affording the plaintiffs at least limited discovery on the facts surrounding the alleged manufacturer's warranty.

CNH contends that I may consider the manufacturer's warranty without converting the motion to one for summary judgment because the warranty qualifies for a limited exception to Rule 12(d) that applies when the documents are ones to which the complaint refers, are concededly authentic, and are central to the plaintiff's claim. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009). However, this exception cannot apply here because the plaintiffs dispute that the documents attached to the motion to dismiss are authentic. The documents are blank, unsigned, and undated, and they otherwise contain no indication that they were provided to the plaintiffs at the time of sale. The plaintiffs state in their brief that they have no record of ever receiving these

9

documents. *See* Br. in Opp. at 6, ECF No. 13. And they do not allege that the documents attached to the motion to dismiss were provided to them at any point, either at the time of sale or later. The only reference in the complaint to a written warranty is in paragraphs 80 and 81, where the plaintiffs allege that "any express warranty that may be valid fails in its essential purpose" and that no warranty disclaimers were included in the contract that formed when the plaintiffs purchased their pickers from CNH dealers. In short, the warranty documents that CNH attaches to its motion to dismiss are neither referred to in the complaint nor concededly authentic. Therefore, I may not consider them when deciding the motion to dismiss. *Hecker*, 556 F.3d at 582.

But this brings me to a related issue, which is a problem for the plaintiffs. In denying that warranty disclaimers were included in the initial sale documents for the pickers at issue, the plaintiffs allege that they purchased their Module Express pickers "through CNH dealers." Compl. ¶ 81. They do not allege that they entered into sales contracts with CNH directly, and they do not allege that the dealers were part of the same legal entity as CNH. If, however, the plaintiffs purchased their pickers from independent dealers, then, under Wisconsin law, any implied warranty of merchantability would be part of the contract between a plaintiff and its dealer, not between a plaintiff and CNH. *See* Wis. Stat. § 402.314(1); *Dippel v. Sciano*, 37 Wis. 2d 443, 452–58 (1967) (refusing to abrogate privity requirement for implied warranty claims and instead creating cause of action in tort for strict liability for unreasonably dangerous products); *Lamont v. Winnebago Industries, Inc.*, 569 F. Supp. 2d 806, 815–16 (E.D. Wis. 2008) (explaining that under Wisconsin law privity is necessary for implied warranty claims and that a manufacturer is not in privity with the ultimate user of its

product when the product was sold to the user by a third party); *Ball v. Sony Electronics Inc.*, No. 05-C-0307, 2005 WL 2406145, at *4 (W.D. Wis. Sept. 28, 2005) (same). In Wisconsin, the only contract claim that a buyer can pursue against a non-seller manufacturer of goods is a claim for breach of the manufacturer's express warranty. *See Sunnyslope Grading, Inc. v. Miller, Bradford and Risberg, Inc.*, 148 Wis. 2d 910, 912–16 (1989); *Lamont*, 569 F. Supp. 2d at 815; *Ball*, 2005 WL 2406145, at *5. Thus, even if CNH never disclaimed all implied warranties, it is difficult to see how the plaintiffs could have valid claims for breach of implied warranty against it.

Still, I do not understand CNH to be seeking dismissal of the implied-warranty claims brought by purchasers of new Module Express pickers for lack of privity. CNH explicitly argues that the implied-warranty claims brought by purchasers of *used* pickers are barred by lack of privity, but it does not make the same argument in connection with the claims brought by purchasers of new pickers. Thus, perhaps CNH concedes that it became a party to the contracts for the sale of new pickers or that it is otherwise possible for an implied warranty to arise between it and the plaintiffs. Accordingly, I will not at this time further consider whether the implied-warranty claims brought by purchasers of new pickers could be dismissed for lack of privity.[3]

In light of the above, I conclude that plaintiff P&J Farms may proceed on a claim for breach of the implied warranty of merchantability in connection with the two new Module Express 635 pickers that it purchased in 2017. With respect to plaintiff T&M Farms, I must consider an additional issue—whether I may dismiss its claim for breach

---

[3] CNH is free to advance a privity argument against purchasers of new pickers during future proceedings in this court, should it choose to do so.

of implied warranty involving the new pickers it purchased in 2011 based on the statute of limitations.

I may not. The statute of limitations is an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), and a plaintiff has no obligation to anticipate and plead around affirmative defenses. *See, e.g., Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). "Complaints need not contain *any* information about defenses and may not be dismissed for that omission." *Id.* (emphasis in original). "Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Id.*

T&M Farms has not pleaded itself out of court. True, it concedes that it purchased its new pickers in 2011, and if that is so the statute of limitations governing a claim for breach of warranty would have expired in 2017, before it commenced this suit. *See* Wis. Stat. § 402.725(1) (six-year statute of limitations for claims for breach of sales contract). But T&M Farms contends that CNH is equitably estopped from asserting the statute of limitations as a defense because it made false statements designed to deter it from filing suit within the limitations period, such as that the problems it was experiencing with the pickers could be fixed. *See Highway Sales, Inc. v. Blue Bird Corp.*, 559 F.3d 782, 789–90 (8th Cir. 2009) (noting that equitable estoppel may apply to claim for breach of warranty based on seller's false assurances that goods could be repaired).[4]

---

[4] T&M Farms also claims that it did not discover its injury until well after it purchased the pickers in 2011. However, a claim for breach of warranty accrues when tender of

12

CNH contends that T&M has failed to adequately plead a basis for equitable estoppel. However, as just discussed, a plaintiff has no obligation to plead around affirmative defenses, and thus its failure to "adequately" plead around a defense is not grounds for dismissal. In any event, the complaint alleges that "[w]hen Plaintiffs and class members would inquire as to the problems they experienced with the pickers, CNH (directly and through its agents and captive dealers) would repeatedly and consistently promise 'patches' and fixes to its customers, falsely representing that the flaws with the Module Express pickers were isolated and fixable, so as to prevent customers from acting on any legal claims." Compl. ¶ 59. Accordingly, T&M Farms' claim for breach of the implied warranty of merchantability cannot be dismissed as untimely.

### 2. Breach of Implied Warranty of Merchantability—Used Pickers

T&M Farms asserts a claim for breach of implied warranty in connection with the used Module Express 635 it purchased in 2016. CNH moves to dismiss this claim for lack of privity.

As discussed in the prior section, under Wisconsin law, the implied warranty of merchantability is part of the sales contract between a buyer and seller. *See* Wis. Stat. § 402.314(1). When a manufacturer sells a product to a distributor, dealer, or other down-stream reseller, it does not become a party to the sales contract that arises between the reseller and the ultimate consumer of the product. *See Dippel v. Sciano*, 37

---

delivery is made, not when the buyer discovers its injury. *See* Wis. Stat. § 402.725(2); *Selzer v. Brunsell Bros., Ltd.*, 257 Wis. 2d 809, 827 (Ct. App. 2002). Thus, T&M Farms' claim for breach of implied warranty accrued in 2011 regardless of when it discovered its injury.

13

Wis. 2d at 452–58; *Lamont*, 569 F. Supp. 2d at 815–16; *Ball*, 2005 WL 2406145, at *4. Thus, such a manufacturer is not liable to the ultimate consumer under an implied-warranty theory.

In the present case, T&M Farms alleges that it purchased its used picker from one of CNH's captive dealers. Compl. ¶ 11. Thus, the seller is the dealer, not CNH, and therefore any implied warranty would have been made by the dealer, not CNH. T&M Farms attempts to avoid this problem by asserting that (1) the dealer agreement between CNH and the dealer made CNH a party to the purchase agreement and (2) the dealer acted as CNH's "agent" for the transaction. *See* Br. in Opp. at 16, ECF No. 30. But T&M Farms does not develop a legal argument explaining how the allegations of its complaint give rise to a reasonable inference that CNH can be considered the seller of the used picker under either of these theories.

As to the first, the complaint does not allege that the dealer agreement between CNH and the dealer made CNH a party to the purchase agreement, and thus I may not assume that it does. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). Moreover, it is difficult to envision how a dealer agreement could make the manufacturer a party to a sales contract between its independent dealer and the dealer's customer. As far as I know, one party to a contract cannot unilaterally add a new party to the contract. Thus, unless the customer were also a party to the dealer agreement, the dealer agreement could not make the manufacturer a party to the sales contract between the dealer and the customer.

As to the second theory, the plaintiff does not explain how the dealer's status as an "agent" of the manufacturer could result in the creation of an implied warranty

14

between the manufacturer and the ultimate customer. A dealer who buys goods from a manufacturer for resale to the consuming public is not the manufacturer's agent. *See Bushendorf v. Freightliner Corp.*, 13 F.3d 1024, 1026 (7th Cir. 1993) (applying Wisconsin law). Moreover, even if the dealer were the manufacturer's agent, agency law does not make a principal a seller of its agent's goods. And here, so far as the complaint reveals, the used pickers were the dealer's goods at the time of sale. The only way agency law could create an implied warranty between CNH and T&M Farms is if the dealer never took title to the used picker and instead acted as a broker for CNH. In this scenario, CNH would have had title to the used pickers at the time they were sold and transferred title directly to T&M Farms pursuant to a contract negotiated by the dealer and T&M Farms, and under which CNH was paid the sales price. But T&M Farms does not allege facts suggesting that this is what occurred. Instead, the complaint alleges that CNH's dealers acquired used pickers through trade-ins and resold them to other customers. *See* Compl. ¶¶ 53–55. The complaint does not allege that CNH participated in these transactions or received any part of the sales price.

Now, the complaint does allege that CNH facilitated these sales by transferring used pickers from one dealer to another and setting the prices the dealers were "contractually required to follow." *See* Compl. ¶ 20. But these facts would not make CNH the seller of the pickers for purposes of the Uniform Commercial Code. Indeed, manufacturers commonly set the prices for resale of their own goods without being deemed the seller of the goods. Resale price maintenance is an issue under Section 1 of the Sherman Act. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 881–82 (2007). If by setting resale prices the manufacturer became the seller of

the goods, then there could be no antitrust issue, for Section 1 of the Sherman Act applies to agreements between separate commercial entities, not to a seller's independent action. *Cf. Twombly*, 550 U.S. at 548–49. Only if CNH owned the pickers at the time of sale and transferred ownership directly to the customer would CNH be the seller. But the complaint does not allege this, and therefore it does not state a claim for breach of implied warranty in the context of used pickers.

I will, however, grant T&M farms leave to replead if it thinks that it can allege facts giving rise to a reasonable inference that the used picker was owned by CNH at the time of sale. Although T&M Farms has already had one opportunity to amend its complaint in response to CNH's motion to dismiss, it did so before the court addressed the motion. The Seventh Circuit has stated that, when granting a motion to dismiss, the court should grant leave to amend unless it is certain that the amendment would be futile or otherwise unwarranted. *See, e.g., O'Boyle v. Real Time Resolutions, Inc.*, 910 F.3d 338, 347 (7th Cir. 2018). Here, I cannot say that it is certain that T&M Farms will be unable to plead facts giving rise to a reasonable inference that CNH was the seller of the used picker. Therefore, I will grant it leave to amend. However, T&M Farms should not exercise its opportunity to amend unless it either has a good-faith basis to believe that CNH owned the picker at the time of sale or is able to develop a cogent legal argument supporting its claim that CNH became a party to the sales contract by some other means.

### 3.   Implied Duty of Good Faith and Fair Dealing

The plaintiffs contend that some of the conduct alleged in the complaint resulted in a breach of the duty of good faith and fair dealing that Wisconsin law implies in every

16

contract. *See In re Chayka's Estate*, 47 Wis.2d 102, 107 & n.7 (1970). The purpose of the implied duty of good faith is to prevent one contracting party from intentionally engaging in unreasonable or arbitrary conduct that has the effect of depriving the other party of the benefit of his bargain. *See Ekstrom v. State of Wisconsin*, 45 Wis. 2d 218, 222 (1969). Here, the plaintiffs allege that three forms of conduct by CNH violated the implied duty of good faith: (1) "misrepresenting and failing to disclose the nature and quality of the pickers sold," (2) "failing to adequately supply parts and support for necessary repairs," and (3) "manipulating the buy-back and resale market for used pickers." Compl. ¶ 87.

The first form of conduct—making misrepresentations and deceptive omissions about the pickers—could not result in a breach of the duty of good faith that was implied in the sales contracts. To the extent that CNH made representations about the pickers that were incorporated into a sales contract, the plaintiffs would have claims for breach of the terms of the contract incorporating the representations, not a claim for breach of the implied duty of good faith. If, however, those representations were not incorporated into the sales contract, then the plaintiffs would have no claim for breach of contract at all. The duty of good faith governs the *performance* of a contract, not the parties' conduct during negotiations. *See Metropolitan Ventures, LLC v. GEA Assocs.*, 291 Wis.2d 393, 408 n.9 (2006) ("[G]ood faith has nothing to do with contract formation. It is about the parties' performance in a contract setting."); *Hauer v. Union State Bank of Wautoma*, 192 Wis.2d 576, 596–97 (Ct. App. 1995) (U.C.C. provision requiring good faith applies to performance and enforcement of contract; "it does not impose a duty of good faith in the negotiation and formation of contracts"); *see also Citadel Group Ltd. v.*

17

*Washington Regional Medical Center*, 692 F.3d 580, 592 (7th Cir. 2012) ("Unlike the duty of good faith imposed on parties in contract performance, there is no inherent duty of good faith with respect to contract formation."); *Betco Corp. v. Peacock*, No. 14-cv-193, 2015 WL 856603, *14 (W.D. Wis. Feb. 27, 2015) ("Overall, Wisconsin case law does not support an independent claim for breach of the covenant of good faith and fair dealing based on pre-contract activity."). Thus, although one might describe a misrepresentation made during contract negotiations as a form of bad faith, and although such a misrepresentation might be actionable under other legal theories, it is not a breach of the duty of good faith that is implied in the resulting contract.

The plaintiffs might respond by claiming that CNH made misrepresentations about the pickers even after they were sold, such as by stating that the problems the plaintiffs were experiencing would be fixed. But these representations could not have deprived the plaintiffs of the benefits they expected to receive under the sales contracts. A buyer's reasonable expectation under a sales contract is to receive the product sold, subject to any applicable warranties and other terms in the contract. If the goods do not satisfy the contract's requirements, then the buyer has a claim for breach that does not depend on the duty of good faith. As discussed above, a seller's post-sale misrepresentations concerning the goods might be grounds for equitably estopping the seller from pleading the statute of limitations as a defense. But those misrepresentations would not themselves deprive the buyer of the benefit of the sales contract. Put simply, the goods are what they are, and if they do not satisfy the contract's requirements, then the buyer has a claim for breach no matter what the seller might say about the goods. And if the goods satisfy the terms of the contract, then the

18

seller's misrepresentations about the goods cannot constitute a breach of the implied duty of good faith.

The plaintiffs next contend that CNH breached the duty of good faith by failing to make or otherwise acquire an adequate supply of replacement parts for the pickers that it sold. Essentially, the plaintiffs contend that every seller of a repairable product has an implied duty to ensure an adequate supply of replacement parts for the product. Under the plaintiffs' argument, once a person sells a repairable product, it is contractually obligated to produce replacement parts (or ensure that some third party produces them) for the expected life of the product. This would be so even if the seller did not expressly promise that replacement parts would be available or issue a warranty guaranteeing that it would make repairs during the product's expected life. The plaintiffs cite no case suggesting that this is the law. Moreover, no reasonable buyer of a product would think that a seller is contractually obligated to supply replacement parts for the life of the product unless the contract expressly required the seller to do so. A buyer might reasonably *assume* that replacement parts will be available for any product it buys, but no buyer could reasonably think that if parts are not available it would have a right to sue the seller for damages. To be sure, if the product came with a repair warranty, and the lack of parts prevented the seller from performing the repairs, then the buyer would have a claim for breach of contract. But then the breach would be of the repair warranty, not of any implied duty to manufacture or otherwise source replacement parts. Thus, absent a specific contractual provision requiring the seller to maintain an adequate supply of replacement parts, the seller's failure to do so could not deprive the buyer of the benefit of the sales contract.

19

In their complaint, the plaintiffs cryptically allege that CNH might have stopped making replacement parts in order to "limit its back-end costs for failing pickers." Compl. ¶ 57. They do not explain what they mean by this, but it does suggest a way that CNH could have breached the implied duty of good faith. If CNH issued a warranty under which it promised to repair pickers at no cost, and if it then intentionally caused the supply of replacement parts to dry up in order to make it impossible to perform repairs in a timely manner, then it might have breached the implied duty of good faith. CNH would comply with the letter of the repair warranty by making the repairs when parts became available, but by delaying the availability of parts, CNH hopes that the customer will grow impatient and withdraw its repair request. Such conduct would have the effect of evading the "spirit" the repair warranty and thus could amount to a breach of the implied duty of good faith. However, the plaintiffs do not sufficiently allege that CNH engaged in conduct of this sort. They do not even allege that CNH issued repair warranties. Thus, at this point, the plaintiffs have failed to state a claim for breach of the implied duty of good faith with respect to replacement parts.

The plaintiffs' third theory of bad faith is that CNH "manipulate[ed] the buy-back and resale market for used pickers." Compl. ¶ 87. The plaintiffs do not explain what this means. However, in their brief, they point to their allegation that "CNH transferred previously-sold pickers—which had already proven to be ineffective—to dealers in other parts of the country to re-sell them to unsuspecting farmers as working and operable pickers." Br. in Opp. at 26, ECF No. 13. I assume that this is the "manipulation" referred to in the complaint. Still, it could not be a breach of the duty of good faith that was implied in the plaintiffs' sales contracts. The sales contracts did not contain terms

20

governing the market for used pickers, and thus even if CNH's conduct could be described as bad faith, it was not bad faith in the performance of the contracts. *See, e.g., Metropolitan Ventures, LLC*, 291 Wis.2d at 408 n.9 (stating that the duty of good faith "is about the parties' performance in a contract setting"). The plaintiffs argue that CNH had a duty to disclose to farmers, before they agreed to purchase the used pickers, that the pickers had been subject to extensive repair claims. But, as discussed above, a misrepresentation or deceptive omission that occurs before the parties enter into the sales contract is not a breach of the implied duty of good faith because that duty governs contract performance and enforcement, not the parties' pre-contracting conduct. *See, e.g., Hauer*, 192 Wis. 2d at 596.

I also reiterate that the plaintiffs have not adequately alleged the existence of a contract between CNH and the buyer of a used picker. If there was no contract, then of course CNH could not have breached the implied duty of good faith and fair dealing that is implied in a contract.

For these reasons, I conclude that the complaint fails to state a claim for breach of the implied duty of good faith and fair dealing. However, to the extent the plaintiffs believe they can allege that CNH intentionally interfered with the supply of replacement parts in order to evade the spirit of repair warranties, I will grant them leave to replead.

### 4. Wisconsin Deceptive Trade Practices Act

The plaintiffs allege claims under Wis. Stat. § 100.18(1), which is part of Wisconsin's Deceptive Trade Practices Act. The purpose of this Act is to protect consumers from untrue, deceptive or misleading representations made to promote the sale of a product. *Hinrichs v. DOW Chemical Company*, 937 N.W.2d 37, 50 (Wis. 2020).

21

A claim under § 100.18(1), has three elements: (1) the defendant made a representation to one or more members of the public with the intent to induce an obligation; (2) the representation was untrue, deceptive or misleading; and (3) the representation materially induced a pecuniary loss to the plaintiff. *Id.* at 56.

Here, the plaintiffs allege that CNH made various statements about the quality and performance of its Module Express pickers that are actionable under § 100.18(1). They describe a marketing scheme devised by CNH's executives in which they represented the Module Express as a reliable, cost-saving piece of equipment when, in fact, they knew the machine was unreliable and would not save farmers money. *See* Compl. ¶¶43–55. The complaint, in paragraph 47, identifies the specific marketing statements at issue. These statements, in large part, consist of classic puffing statements that are not actionable under the Deceptive Trade Practices Act. *See Tietsworth v. Harley-Davidson, Inc.*, 270 Wis.2d 146, 171 (2004) (holding that puffery is not actionable under § 100.18). Puffery is "the exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined." *Id.* In the present case, statements that meet the definition of puffery include representations that the Module Express "has the power to pick in the toughest conditions," that it is "the most efficient cotton-harvesting package available," and that it is "the most profitable" way to harvest cotton. Compl. ¶ 47.

However, at least some of the alleged statements appear to be statements of fact that might be actionable under the Deceptive Trade Practices Act. One such statement is that the Module Express "harvests just as effectively on wet or dry ground." *Id.* Although the meaning of "just as effectively" could be a matter of opinion, the statement

as a whole implies that the Module Express will not routinely get stuck in the mud. If, in fact, the machine routinely gets stuck in the mud or is useless on wet ground, then this representation would be false. Another potentially non-puffing statement is the representation that the Module Express will "create consistent domed [rectangular] modules for excellent weatherability and ginning." *Id.* The phrase "excellent weatherability and ginning" is, by itself, a statement of opinion. However, the representation that the picker will create "consistent domed [rectangular] modules" adds a representation of fact that can be proved false. If the modules fall apart as soon as they are deposited in the field and cannot be transported to a gin, then in no sense could the picker be said to be capable of producing "consistent domed [rectangular] modules for excellent weatherability and ginning."

But while some of the alleged marketing statements might be actionable, the plaintiffs have not identified which of the many marketing statements alleged in paragraph 47 "materially induced" them to suffer a "pecuniary loss," as required by the third element of a claim under § 100.18(1). The complaint alleges that the false statements were made in "marketing brochures, press releases, statements on CNH's website, and form statements by CNH dealers." Compl. ¶ 47. However, the complaint does not allege that any person affiliated with either of the plaintiffs read any of these brochures or press releases, visited CNH's website, or heard any specific "form statement."[5] To be sure, each plaintiff generally alleges that their CNH dealer made statements to them about the quality and performance of the Module Express picker,

---

[5] Also, the plaintiffs do not explain what a "form statement" consists of, and I am unfamiliar with the term. I assume it means some sort of script that CNH provides to its dealers.

23

but neither plaintiff identifies the precise content of the statements they encountered, and neither plaintiff claims to have encountered *all* the statements identified in paragraph 47. Because the alleged statements include both non-actionable puffery and arguably actionable statements of fact, unless I know which statements the plaintiffs encountered, I cannot conclude that they have plausible claims under § 100.18.

For these reasons, the plaintiffs' claims under § 100.18 based on the statements alleged in paragraph 47 of the complaint will be dismissed. However, I will grant the plaintiffs leave to replead. In repleading, the plaintiffs must identify the specific marketing statements they claim materially induced them to incur a pecuniary loss. This generally means that the plaintiffs must identify which statements they read or heard before deciding to purchase each of the Module Express pickers at issue in this case. A claim under § 100.18 is not a claim for fraud and therefore does not have to be pleaded with particularity. *See Hinrichs*, 937 N.W.2d at 53–55.[6] But the plaintiffs must still plead enough non-conclusory factual matter to state a claim for relief that is plausible on its face. *See Twombly*, 550 U.S. at 570. The plaintiffs cannot state plausible claims under § 100.18 without identifying the contents of the allegedly untrue statements that materially induced them to suffer a pecuniary loss.

In addition to claims based on the marketing statements contained in paragraph 47, the plaintiffs allege a claim under § 100.18 based on CNH's allegedly falsely

---

[6] In *Hinrichs*, the Wisconsin Supreme Court held that a claim under § 100.18 is not subject to Wisconsin's heightened pleading standard for fraud claims. Although this decision is not controlling as to the meaning of the federal pleading standard for fraud contained in Federal Rule of Civil Procedure 9(b), I must follow the Wisconsin Supreme Court's holding that a claim under § 100.18 is not a claim for fraud. And because a claim under § 100.18 is not a claim for fraud, Rule 9(b) does not apply.

24

representing that previously owned Module Express pickers are "operational, in good working order, and capable of picking and bailing cotton." Compl. ¶ 67. However, only T&M Farms purchased a previously owned picker, so only it could assert such a claim. Moreover, as discussed above in connection with the claim for breach of implied warranty, T&M Farms alleges that it purchased its used picker from a CNH dealer, not directly from CNH. Compl. ¶ 11. Thus, it is unclear how CNH could have made a representation to T&M Farms that the used picker it purchased was operational, in good working order, and capable of picking and bailing cotton. Indeed, earlier in the complaint, the plaintiffs expressly allege that CNH's dealers are the ones who tell prospective purchases that the used pickers are operable, in good working order, and capable of picking and baling cotton. *Id.* ¶ 55. Therefore, it was the dealer, rather than CNH, that made the allegedly deceptive statements. In any event, T&M Farms does not allege that anyone at CNH told it that the used picker it purchased was operational, in good working order, and capable of picking and baling cotton. Thus, T&M Farms has not alleged that CNH made an untrue, deceptive, or misleading statement about the picker that materially induced it to suffer a pecuniary loss.[7]

T&M Farms also seems to allege that CNH had a duty to disclose that the used picker it purchased had suffered several mechanical failures while it was in the possession of the original owner. *See* Compl. ¶ 12. Again, however, because it was the

---

[7] The plaintiffs allege in conclusory fashion that the dealers acted as CNH's agents. However, as explained in my discussion of implied warranties, the plaintiffs have not alleged that CNH owned the used pickers at the time of sale. Thus, when the dealers made statements about the used pickers, they were trying to induce sales of their own goods, not CNH's goods. Therefore, the complaint does not give rise to a reasonable inference that, when the dealers made statements about the used pickers, they were acting as agents of CNH.

25

dealer rather than CNH that made the sale, any duty to disclose would have been the dealer's, not CNH's. In any event, omissions are not actionable under the Wisconsin Deceptive Trade Practices Act. *Tietsworth*, 270 Wis. 2d at 169–71. Therefore, even if T&M Farms dealt with CNH directly when purchasing the used picker, it would have no claim under § 100.18 based on the failure to disclose the picker's history of prior breakdowns.

For these reasons, T&M Farms' claim under § 100.18 based on its purchase of a used picker will be dismissed. However, I will grant it leave to replead. If T&M farms chooses to replead, it must allege facts from which it reasonably can be inferred that CNH—rather than its dealer—made untrue, deceptive, or misleading statements about the quality of the used picker it purchased.

### 5. Fraud

The plaintiffs next allege that CNH committed common-law fraud by making the marketing statements identified in paragraph 47 of the complaint and by failing to disclose that the Module Express pickers suffered from "significant design and manufacturing flaws." Compl. ¶ 98. The defendants move to dismiss this claim for several reasons, but I will discuss only one—the economic loss doctrine—because it is dispositive.

The economic loss doctrine precludes recovery in tort for economic losses resulting from the failure of a product to live up to a contracting party's expectations. *Tietsworth*, 270 Wis. 2d at 162. The doctrine generally requires transacting parties to pursue only their contractual remedies when asserting an economic loss claim. *Id.* at 163. "Economic loss," for purposes of the doctrine, includes the diminution in the value

26

of the product because it is inferior and does not work for the general purposes for which it was manufactured and sold. *Id.* It includes both direct economic loss and consequential economic loss. *Id.*

The economic loss doctrine applies to common-law fraud claims alleging that the seller of a product made misrepresentations pertaining to "the character and quality of the goods that are the subject matter of the contract." *Id.* at 167. In the present case, all the alleged fraudulent statements and omissions concern the character and quality of the Module Express pickers. The plaintiffs allege that CNH represented that the pickers are efficient, cost effective, powerful machines that will operate in all weather conditions, will produce consistent, well-formed modules, and will require less maintenance than traditional pickers. Compl. ¶ 97. Obviously, all these statements relate to the character and quality of the goods sold. Likewise, the alleged fraudulent omissions—failing to disclose that the Module Express pickers suffered from significant design and manufacturing flaws—relate to the character and quality of the goods. Thus, the economic loss doctrine applies.

The plaintiffs make two arguments as to why the economic loss doctrine does not apply. First, they contend that the "fraud in the inducement" exception applies. This is a "narrow" exception that applies when a contracting party engages in fraudulent behavior during negotiations and prevents the other party from making an informed decision as to the allocation of risk under the contract. *See Hinrichs*, 937 N.W.2d at 47. For the exception to apply, the fraud must be "extraneous to, rather than interwoven with, the contract." *Id.* For the fraud to be extraneous to the contract, it must pertain to a matter other than the quality or characteristics of the goods sold. *Id.* Here, as just discussed, all

27

the allegedly fraudulent statements and omissions relate to the quality and characteristics of the Module Express pickers. Thus, the fraud-in-the-inducement exception does not apply.

Second, the plaintiffs contend that they "seek other damages through their fraud claim which are not subject to the economic loss rule." Br. in Opp. at 23, ECF No. 13. They describe such damages as those "stemming from lost crops, ancillary repairs, additional labor costs, diminished value, and cotton gin fees." *Id.* However, these are all direct or consequential economic losses caused by the failure of the Module Express pickers to live up to the plaintiffs' expectations. The economic loss doctrine applies to such losses. *See Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis.2d 395, 401 (1998) (explaining that economic loss doctrine bars tort claims for both direct economic loss and consequential economic loss).

The plaintiffs also suggest that the "other property" exception to the economic loss doctrine applies. This exception applies when a defective product causes damage to property other than the product itself. *See Grams v. Milk Products, Inc.*, 283 Wis. 2d 511, 516 (2005). Here, however, the plaintiffs do not expressly identify any property besides the pickers that were damaged. Perhaps the plaintiffs mean to refer to P&J Farms' allegation that the pickers' "poor performance" caused its cotton to be of lower quality after it was harvested. Compl. ¶ 17. If so, however, such damage would not fall within the other-property exception. The Wisconsin Supreme Court has held that the other-property exception does not apply when the property damage was caused by the failure of the product to live up to the buyer's expectations. *See Grams*, 283 Wis. 2d at 528–35 (adopting "disappointed expectations" rule). Under this rule, if a product is

28

expected and intended to interact with other products and property, and if the cause of the damage to those other products and property stems from the parties' expectations about the function of the bargained-for product, then recovery in tort is precluded. *State Farm Fire & Cas. Co. v. Hague Quality Water, Int'l*, 345 Wis. 2d 741, 750 (Ct. App. 2012). Here, the disappointed-expectations rule would apply to any claim that the cotton harvested with the Module Express pickers was of low quality. Obviously, a cotton picker is expected and intended to interact with cotton crops. Moreover, P&J Farms alleges that the cause of the harm to its cotton was the pickers' "poor performance," and thus the harm stemmed from the parties' expectations about the function of the bargained-for product. Compl. ¶ 17. Accordingly, the other-property exception does not apply.

Because the plaintiffs' fraud claims are barred by the economic loss doctrine, I will dismiss them. Moreover, because it is certain from the face of the complaint that the plaintiffs cannot avoid the economic loss doctrine by repleading, I will not grant them leave to amend. *See O'Boyle*, 910 F.3d at 347.

### 6.    Unjust Enrichment

Finally, the defendants move to dismiss the plaintiffs' claim for unjust enrichment on the ground that such a claim may succeed only in the absence of an enforceable contract between the parties. *See Greenlee v. Rainbow Auction/Realty Co.*, 202 Wis. 2d 653, 671 (Ct. App. 1996) ("The doctrine of unjust enrichment does not apply where the parties have entered into a contract."). However, as discussed above, at this point it is not clear whether the plaintiffs have entered into contracts with CNH. CNH argues that it entered into a contract with the purchasers of new pickers by making its limited express

29

warranty. But, as discussed, that argument depends on matters outside the pleadings and cannot be resolved on a motion to dismiss. Moreover, CNH disputes that it entered into contracts with any purchaser of a used picker. Because claims for breach of contract and unjust enrichment can be pleaded in the alternative, *see* Fed. R. Civ. P. 8(d)(2), I will not dismiss the unjust-enrichment claims at this time.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendant's motion to dismiss the First Amended Class Action Complaint (ECF No. 11) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that the following claims are dismissed: (1) T&M Farms' claim for breach of the implied warranty of merchantability regarding its used picker; (2) all claims for breach of the implied duty of good faith and fair dealing; (3) all claims for violation of the Wisconsin Deceptive Trade Practices Act; and (4) all claims for common-law fraud. In all other respects, the motion is denied. Further, the plaintiffs are granted leave to replead their claims under the Deceptive Trade Practices Act and their claim for breach of the implied duty of good faith and fair dealing involving the failure to supply replacement parts. T&M Farms is granted leave to replead its claim for breach of the implied warranty of merchantability regarding its used picker. The plaintiffs are not granted leave to replead their claims for common-law fraud.

**IT IS FURTHER ORDERED** that the defendant's motion to dismiss the original complaint (ECF No. 7) is **DENIED** as **MOOT**.

Dated at Milwaukee, Wisconsin, this 5th day of March, 2020.

s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge

30