# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**T&M FARMS and P&J FARMS, on behalf**
**of themselves and others similarly situated,**
   **Plaintiffs,**

   **v.**        **Case No. 19-C-0085**

**CNH INDUSTRIAL AMERICA, LLC,**
   **Defendant.**

---

## DECISION AND ORDER

Two cotton farms allege that they purchased cotton pickers manufactured by CNH Industrial America, LLC ("CNH"), that failed to perform as expected. They bring this case as a proposed class action and allege claims for violation of the Wisconsin Deceptive Trade Practices Act ("DTPA"), breach of the implied warranty of merchantability, breach of the implied duty of good faith and fair dealing, fraud, and unjust enrichment. In a prior order, I dismissed some of the plaintiffs' claims and granted them leave to amend. The plaintiffs have filed an amended complaint (the Second Amended Class Action Complaint), which CNH now moves to dismiss for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

## I. BACKGROUND

T&M Farms is a cotton farm in Arkansas. P&J Farms is a cotton farm in Alabama. Each farm purchased cotton pickers from CNH's "Module Express" line. T&M Farms purchased two new Module Express pickers in 2011 and then traded them in for a used Module Express picker in 2016. P&J Farms purchased two new Module Express

pickers in 2017. Both plaintiffs obtained their Module Express pickers through CNH's independent dealers.

CNH markets pickers in its Module Express line as being capable of picking cotton from the field and building the harvested cotton into gin-ready modules. Before the development of pickers such as the Module Express, cotton farms used three different pieces of equipment (a picker, a boll buggy, and a module builder) to harvest cotton. Pickers such as the Module Express are intended to harvest cotton more efficiently than would be possible using three different machines.

The plaintiffs allege that the Module Express pickers they purchased did not perform as well as they expected. They allege that the defects in the machines rendered them unmerchantable. They further allege that CNH made various misrepresentations about the quality and performance of the pickers in their marketing materials. They also allege that CNH failed to ensure that sufficient replacement parts would be available to make needed repairs. Based on this conduct, the plaintiffs allege claims for breach of implied warranty, violation of Wisconsin's Deceptive Trade Practices Act, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. CNH moves to dismiss all claims.[1]

## II. DISCUSSION

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A

---

[1] When the plaintiffs filed this action, they also alleged that CNH's conduct amounted to fraud. In my decision on CNH's last motion to dismiss, I dismissed the fraud claims without leave to amend. Thus, I do not discuss the fraud claims here.

2

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In construing a plaintiff's complaint, I assume that all factual allegations are true but disregard statements that are conclusory. *Iqbal*, 556 U.S. at 678.

## A.    Wisconsin Deceptive Trade Practices Act

The plaintiffs allege claims under Wisconsin Statute § 100.18(1), which is part of Wisconsin's Deceptive Trade Practices Act ("DTPA"). The purpose of the DTPA is to protect consumers from untrue, deceptive or misleading representations made to promote the sale of a product. *Hinrichs v. DOW Chemical Company*, 937 N.W.2d 37, 50 (Wis. 2020). A claim under § 100.18(1), has three elements: (1) the defendant made a representation to one or more members of the public with the intent to induce an obligation; (2) the representation was untrue, deceptive or misleading; and (3) the representation materially induced a pecuniary loss to the plaintiff. *Id.* at 56.

The plaintiffs allege that CNH made various statements about the quality and performance of its Module Express pickers that are actionable under § 100.18(1). They describe a marketing scheme devised by CNH's executives in which CNH represented the Module Express as a reliable, cost-saving piece of equipment when, in fact, they knew the machine was unreliable and would not save farmers money. In deciding CNH's last motion to dismiss, I determined that many of the allegedly deceptive statements were classic puffing statements that are not actionable under the DTPA.

3

*See Tietsworth v. Harley-Davidson, Inc.*, 270 Wis. 2d 146, 171 (2004) (puffery is not actionable under § 100.18). But I thought that some of the alleged statements might not be puffery, including CNH's representation that the Module Express "harvests just as effectively on wet or dry ground," and that it will "create consistent domed modules for excellent weatherability and ginning." As to these potential non-puffing statements, I concluded that the plaintiffs had not adequately pleaded that they encountered them before purchasing their pickers. I thus dismissed the plaintiffs' DTPA claims but granted them leave to amend to add the missing details.

In moving to dismiss the second amended complaint, CNH does not contend that the plaintiffs have failed to plead that they encountered the potential non-puffing statements. But CNH contends that the DTPA claims must be dismissed for other reasons. First, it contends that the DTPA's three-year statute of repose, Wis. Stat. § 100.18(11)(b)3, bars claims based on statements made before January 14, 2016. Second, it contends that the plaintiffs have not adequately identified the marketing statements on which their claims depend. Third, it contends that the statements at issue qualify as puffery. Fourth, it contends that the plaintiffs have not pleaded that they suffered pecuniary losses as a result of statements made on or after January 14, 2016, *i.e.*, within the three-year period allowed by the statute of repose. Finally, CNH contends that the statements at issue are not subject to the Wisconsin DTPA because the plaintiffs encountered the statements and acted on them outside of Wisconsin.

4

I begin by considering whether the Wisconsin DTPA applies to the marketing of Module Express pickers.[2] This presents a question of statutory interpretation. The relevant text is as follows:

> No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wis. Stat. § 100.18(1). It is helpful to remove some of the synonyms and other clarifying terms that do not apply to this case to reveal the basic structure and meaning of this provision. Doing so yields the following: No person, with intent to induce the public to enter into any contract relating to the purchase of merchandise, shall make or cause to be made, in this state, a representation of any kind to the public relating to the

---

[2] In its motion to dismiss the claims of T&M Farms and P&J Farms, CNH did not argue that the Wisconsin DTPA does not apply to the alleged statements. However, CNH made this argument in support of the motions to dismiss it later filed in seven related cases in which cotton farmers are represented by counsel for T&M and P&J. Because the material facts are identical in all cases, plaintiffs' counsel has briefed the issue in the other cases, and the argument presents an issue of law, I will also consider the argument here.

merchandise that contains a representation or statement of fact that is untrue, deceptive, or misleading.

Here, I cannot say that CNH made deceptive representations about Module Express pickers "in this state." Such pickers are used exclusively by cotton farms, and there are no cotton farms in Wisconsin. For this reason, CNH did not advertise the Module Express in Wisconsin publications or make representations about the machines to Wisconsin residents. Instead, CNH targeted cotton farms in cotton-producing states like Arkansas and Alabama. *See* Compl. ¶ 20 (alleging that deceptive marketing scheme targeted "cotton farmers"). The plaintiffs themselves encountered the statements at gin shows in the South, *see* Compl. ¶¶ 40 &44, in trade publications geared towards cotton farmers, *id.* ¶¶ 41, 45, and at the CNH dealerships they visited in their communities, *id.* ¶¶42, 46.

The plaintiffs contend that CNH's representations were made in Wisconsin because CNH "caused them to exist from its corporate headquarters in Racine, Wisconsin." Compl. ¶ 20. In the plaintiffs' view, the applicability of the DTPA turns on the physical location of the person who makes the allegedly deceptive statements or causes them to be made, rather than on the geographic area in which the statements are encountered by the public. That is, the plaintiffs interpret the phrase "in this state" to refer to the physical location of the advertiser at the time the advertiser makes the allegedly deceptive statements or causes them to be made. However, this interpretation fails to place the relevant language in context and to read it in light of the statute's overall purpose. See *State ex rel. Kalal v. Circuit Court for Dane County*, 271 Wis.2d 633, 663–65 (2004) (context and purpose of statute are relevant to statutory

6

interpretation). Nothing in § 100.18(1) suggests that its purpose is to regulate advertisers who are physically located in Wisconsin but who advertise elsewhere. To the contrary, its purpose is to protect Wisconsin residents from deceptive advertising. *See K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 301 Wis. 2d 109, 129 (2007) ("the purpose of the DTPA includes protecting Wisconsin residents from untrue, deceptive, or misleading representation made to induce action"). An advertiser who is physically located outside of Wisconsin can make deceptive representations to Wisconsin residents or cause such representations to be made to residents here. Thus, to achieve the DTPA's statutory purpose of protecting Wisconsin residents from deceptive advertising, the phrase "in this state" must be understood as referring to the location of the *advertising* rather than the *advertiser*. In other words, a person who disseminates deceptive advertising to Wisconsin residents is a person who violates § 100.18(1), no matter where that person is physically located at the time the advertising is disseminated. *Cf.* 17 Op. Wis. Atty. Gen. 194 (1928) (opining that a firm located in Chicago that advertises merchandise in Wisconsin publications may be liable under § 100.18). And because "in this state" refers to the location of the advertising rather than the advertiser, advertising in other states is not actionable under the DTPA, even if the advertiser is physically located here.

In support of their argument that "in this state" refers to the physical location of the person who causes the advertising to exist, the plaintiffs cite *Le v. Kohls Department Stores, Inc.*, 160 F. Supp. 3d 1096 (E.D. Wis. 2016). In that case, a judge of this court interpreted the DTPA to apply to marketing practices used by Kohl's Department Stores, which has its headquarters in Wisconsin, even though the plaintiff encountered the

7

allegedly deceptive statements at one of Kohl's stores in California. *Id.* at 1115. However, the plaintiff in *Le* alleged that Kohl's used the same advertising strategy at all its stores in the United States, which included stores in Wisconsin. *See id.* at 1099 (stating that plaintiff alleged that deceptive practices were "company-wide"). Thus, while the plaintiff may have encountered the statements in California, the statements at issue were also "made" in Wisconsin. In the present case, however, CNH did not sell or market the Module Express in Wisconsin, and therefore it did not make the allegedly deceptive representations "in this state."

It is true that the court in *Le* seemed to rest its decision on Kohl's physical presence in Wisconsin. But I am not persuaded by the court's reasoning on that point. The court concluded that because the dictionary defines "make" as "to cause something to exist," the DTPA applies to statements that a person in this state causes to exist. *Id.* at 1115. But this analysis fails to consider how the word "make" and the phrase "in this state" interact in § 100.18(1). As I have noted, a person can cause advertising to reach consumers in Wisconsin without being physically present here, and under the DTPA that person would be deemed to have made the advertising statements here. This shows that the phrase "in this state" does not refer to the location of the advertiser, but to the location of the advertising. When this understanding of "in this state" is combined with the word "make," the language of the statute means that a person "makes" a marketing statement "in this state" when the person causes the advertising to exist in this state, not when a person in this state causes the advertising to exist somewhere else in the world.

8

One might contend that, because CNH marketed the Module Express on its website and in agricultural magazines, its marketing statements should be deemed to have been "made" in Wisconsin, since anyone in Wisconsin could have viewed CNH's website or obtained the agricultural publications through the mail. But this reading of "made" would produce absurd results, in that it would subject every person who advertises on the Internet or in publications to the Wisconsin DTPA, even if the advertising is unlikely to reach Wisconsin residents. For example, this reading would allow an Arizona resident to sue an Arizona used car dealership that makes claims about its inventory on its own website under the Wisconsin DTPA simply because a Wisconsin resident could have visited the dealership's website from a computer in Wisconsin. Nothing in the text or purpose of the DTPA suggests that this extraterritorial effect was intended. *See Wis. Indus. Energy Grp., Inc. v. Pub. Serv. Comm'n*, 342 Wis. 2d 576, 602 (2012) (noting that Wisconsin presumes that its laws have no extraterritorial effect).

For these reasons, I conclude that the Wisconsin DTPA does not apply unless a person makes a deceptive representation that is likely to reach and induce action by a purchaser in Wisconsin. Because there are no cotton farms in Wisconsin, CNH's marketing statements regarding the Module Express were unlikely to reach or induce action by a Wisconsin resident. Accordingly, those statements are not within the scope of the Wisconsin DTPA, and the plaintiffs' claims under § 100.18(1) will be dismissed.[3]

**B.      Breach of Implied Warranty of Merchantability**

---

[3] Because I conclude that the Wisconsin DTPA does not apply to the statements, I do not consider the defendant's remaining grounds for dismissal of the DTPA claims.

9

The plaintiffs allege that the defects in the Module Express pickers they purchased made them unmerchantable and that therefore CNH breached the warranty of merchantability that the Uniform Commercial Code ("UCC") implies in most contracts for the sale of goods. Under the UCC, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind and the seller did not disclaim the warranty. Wis. Stat. § 402.314(1).[4] In my decision on CNH's last motion to dismiss, I determined that the plaintiffs had not alleged that CNH was a party to the contracts that resulted in sales of Module Express pickers to the plaintiffs. The plaintiffs had alleged that they purchased their machines from independent dealers, which, if true, would make the dealers the sellers of the goods and the ones liable for breach of implied warranty. But I granted the plaintiffs leave to amend if they thought they could plead facts showing that CNH was a party to the contracts for sale of the Module Express pickers. In the second amended complaint, the plaintiffs attempt to plead such facts. CNH contends that the plaintiffs' allegations do not give rise to a plausible claim.

Before assessing the parties' arguments, I note that two types of sales transactions are at issue here: sales of new Module Express pickers, and sales of used Module Express pickers that were acquired as trade-ins from other farmers. Plaintiff T&M Farms purchased new and used Module Express pickers, while plaintiff P&J

[4] CNH contends that the plaintiffs' claims are controlled by the versions of the UCC enacted by the states in which they purchased their Module Express pickers, which in this case was Arkansas and Alabama. The plaintiffs do not dispute this point. However, no party identifies any material difference in the versions of the UCC in force in the states of purchase and in Wisconsin. For convenience, and because I applied Wisconsin's version of the UCC in my decision on CNH's last motion to dismiss, I will cite to Wisconsin's version of the UCC in this opinion.

Farms purchased only new pickers. The relevant factual allegations regarding each type of sale are slightly different. Thus, while the legal principles and some of the basic facts are identical in both types of transactions, I will discuss some aspects of new and used sales separately.

In assessing whether the plaintiffs have plausibly alleged that CNH was a party to the sales contracts, I start by noting that the plaintiffs allege that they purchased their pickers at CNH dealers. Compl. ¶¶ 12, 14. It is common knowledge that, in the usual manufacturer-dealer relationship, the manufacturer sells its goods to the dealer, who in turn resells them to the end user. *See, e.g., Bushendorf v. Freightliner Corp.*, 13 F.3d 1024, 1026 (7th Cir. 1993) (noting that dealers ordinarily buy goods from manufacturers or other suppliers for resale to the consuming public). For this reason, manufacturers ordinarily are not parties to sales contracts that arise when dealers sell the manufacturers' products to consumers.[5] Thus, to plead plausible claims for breach of implied warranty here, the plaintiffs must allege facts giving rise to a reasonable inference that CNH and its dealers were involved in an unusual relationship in which either CNH sold its products directly to consumers or CNH and its dealers were joint sellers of the goods.

The plaintiffs have not succeeded in doing this. With respect to new pickers, the plaintiffs allege that because CNH dealers finance their inventory of Module Express pickers through CNH's lending affiliate (known as CNH Industrial Capital), CNH must be deemed to be a seller of the machines to farmers. *See* Compl. ¶¶ 52–57. The plaintiffs'

---

[5] However, manufacturers can be liable to consumers for breach of any express warranties they made concerning the goods. *See Sunnyslope Grading, Inc. v. Miller, Bradford and Risberg, Inc.*, 148 Wis. 2d 910, 915–16 (1989).

allegations begin with the assertion that "[w]hen a dealer takes delivery of a Module Express, it is deemed to owe [CNH] some given amount—through CNH Industrial Capital—that will be paid out of the eventual amount that is paid by a purchaser." *Id.* ¶ 52 (footnote omitted). The plaintiffs then allege that, when a dealer has a farmer interested in purchasing a Module Express, the dealer, CNH, and CNH Industrial Capital will enter into a "settlement" process through which the final price of the picker is set and the amount the dealer must repay is determined. *Id.* ¶ 53. According to the plaintiffs, under the terms of this financing arrangement, CNH will sometimes grant a dealer a credit "against its total balance" when a picker is sold. *Id.* ¶ 54. When a picker does not sell immediately, CNH will sometimes "decrease the amount owed by the dealer" by "forgiving the interest due." *Id.*

What the plaintiffs are describing here is a loan from CNH Industrial Capital to the dealer to finance its inventory of Module Express pickers. More specifically, they are describing what is known as "floor planning" or "floor plan financing." This is a method of financing dealers' purchases of inventory, *see Foy v. First Nat'l Bank of Elkhart*, 868 F.2d 251, 252–53 (7th Cir. 1989), and it enables a dealer to buy cars—or, as in this case, farm equipment—in bulk, *see United States v. Dridi*, 952 F.3d 893, 896 (7th Cir. 2020) (cars); *Centerre Bank, N.A. v. New Holland Div. of Sperry Corp.*, 832 F.2d 1415, 1416 (7th Cir. 1987) (farm equipment). Under these loans, which are generally set up as revolving lines of credit, *see Brazell v. First Nat. Bank and Trust Co. of Rockford*, 982 F.2d 206, 207 (7th Cir. 1992), a dealership agrees that, when a customer purchases inventory, the dealership will pay the floor-plan lender the amount borrowed for that item

12

of inventory. *Dridi*, 952 F.3d at 896. While the inventory remains unsold on the dealership floor, the lender retains a security interest. *See Brazell*, 982 F.2d at 207.

The plaintiffs contend that CNH and its lending arm are alter egos of one another or are so closely aligned that the legal relationship of CNH Industrial Capital to dealers must be imputed to CNH. *See* Compl. ¶ 19. The non-conclusory factual matter alleged in the complaint does not support this contention, but even if it did, it is hard to see any way in which the financing relationship between CNH and its dealers could result in CNH being a seller of Module Express pickers to farmers. In fact, the existence of the financing arrangement is nearly conclusive proof that CNH does not sell directly to farmers—for what purpose could the loan serve other than to finance the dealer's purchase of inventory from CNH? Thus, when a dealer sells inventory to a farmer, it resells merchandise that it previously purchased from CNH. This makes the dealer, rather than CNH, the entity that enters into the sales contract with the farmer.

The plaintiffs allege that, because of the financing arrangement, "[t]he delivery of the Module Express to a dealer does not divest [CNH] of its ownership interest of the Module Express pickers." Compl. ¶ 55. Notably, this allegation is a legal conclusion that I do not have to accept as true. *See Iqbal*, 556 U.S. at 678.[6] In any event, CNH's retaining an "ownership interest" in a picker while it is on the dealer's lot would not make it a party to the contract for the sale of the picker to a farmer. The implied warranty of merchantability is implied in the contract for the sale of goods. *See* Wis. Stat. § 402.314(1). A seller can enter into such a contract even if it does not hold title to the

---

[6] For the same reason, I disregard the plaintiffs' various allegations that CNH "retains an ownership stake" in the pickers or that CNH was "a party" to the sales contracts. *See, e.g.,* Compl. ¶¶ 51, 52, 56.

13

goods at the time of contracting. *See id.* § 402.106(4) (defining "contract for sale" to include a contract to sell goods at a future time); *id.* § 402.401 ("Each provision of this chapter with regard to the rights, obligations, and remedies of the seller, the buyer, purchasers, or other 3rd parties applies irrespective of title to the goods except where the provision refers to such title."). Of course, the seller must pass title to the buyer at some point. *Id.* § 402.106(6) (defining a "sale" as the passing of title from the seller to the buyer for a price). But here, the plaintiffs' nonconclusory factual allegations make clear that, through the floor-plan settlement process, the dealer obtains title to the goods and then passes it on to the farmer for a price. *See* Compl. ¶ 53 (alleging that the dealer "consummate[s] a sale to the farmer" after completing the settlement process); *id.* ¶ 55 (alleging that CNH's involvement in each Module Express sale ends when it "determines the terms of the dealer's acceptance of the goods and the sale to the farmer is completed"). Thus, because it is the dealer who enters into the contract for sale with the farmer, not CNH, CNH's retaining an "ownership interest" in the pickers up to the moment of the dealer's fulfillment of the sales contract does not make it liable for breach of the implied warranty of merchantability.

Along the same lines, plaintiff P&J Farms alleges that the two pickers it purchased were not in the dealer's inventory at the time it contracted to purchase them. Compl. ¶ 57. P&J alleges that the dealer told it that it was "purchasing brand new machines directly 'from the factory' where the machines were not even fully assembled yet." *Id.* But, as I just noted, a seller does not need to have title to the goods at the time of contracting in order to enter into a contract for the sale of the goods. Thus, P&J and the dealer could enter into a contract for the sale of goods that CNH had not yet

14

delivered to the dealer. CNH would not have to be a party to the sales contract for the dealer to fulfill its obligation to deliver the machine to the farmer once it was ready. And here, P&J does not allege facts indicating that it contracted directly with CNH for the pickers. Instead, it alleges that one of CNH's dealers convinced it to trade in its existing equipment and purchase two new Module Express pickers. *Id.* ¶¶ 14–15. P&J does allege that "the purchase order documents for Plaintiffs' new pickers purport to include [CNH] as a party," *id.* ¶ 57, but this cryptic allegation is not enough to give rise to a reasonable inference that P&J purchased directly from CNH rather than through a dealer. P&J does not allege that it sent its own purchase order directly to CNH, and thus the only reasonable inference to be drawn from this allegation is that the dealer's purchase order to CNH listed CNH as a party to the sale of the pickers to the dealer. CNH's being a party to a contract to sell to the dealer does not make it a party to the dealer's contract to sell to the farmer.

For these reasons, I conclude that CNH was not a party to a contract for sale of new Module Express pickers to the plaintiffs. As for used pickers (which only T&M Farms purchased), the plaintiffs allege that CNH was involved in their sale in the same way it was involved in the sale of new machines. Compl. ¶¶ 59–60. According to the plaintiffs, a used Module Express picker is difficult to sell in the community where the dealer acquired it because other farmers in the area know that the original owner had complained about its performance. Thus, when a dealer accepts a used Module Express as a trade in, CNH steps in and ensures that the used Module Express is transferred to a dealership in a different community for resale to a farmer who does not know the original owner. The plaintiffs allege that CNH does this by acquiring the used

15

Module Express from the dealer who accepted it as a trade in and then placing it in the inventory of a dealer located elsewhere. The final sale of the used picker to a new farmer then proceeds under the same "settlement" process that applies to new pickers. *Id.* ¶ 59.

As I discussed above, the plaintiffs' allegations establish that the settlement process was part of an arrangement through which the dealer financed its inventory. Thus, by incorporating their allegations concerning the settlement process to the sale of used pickers, the plaintiffs have alleged that the dealers purchased the used pickers from CNH on credit and then paid off the loan at the time the pickers were sold. And, as I have already discussed, this financing arrangement did not make CNH a party to the sales contracts that the dealers entered into with farmers.

For these reasons, I conclude that the complaint does not give rise to a reasonable inference that CNH was a party to the contracts for the sale of new or used Module Express pickers to the plaintiffs. Because CNH was not a party to the sales contracts, it is not liable for breach of the implied warranty of merchantability. The plaintiffs' claims under the UCC will be dismissed.

**C.    Breach of Implied Duty of Good Faith and Fair Dealing**

The plaintiffs contend that CNH breached of the duty of good faith and fair dealing that Wisconsin law implies in every contract. *See In re Chayka's Estate*, 47 Wis.2d 102, 107 & n.7 (1970).[7] The purpose of the implied duty of good faith is to prevent one contracting party from intentionally engaging in unreasonable or arbitrary

---

[7] The parties do not raise an issue concerning choice of law for this claim, and therefore I apply forum law. *See, e.g., Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991).

conduct that has the effect of depriving the other party of the benefit of his bargain. *See Ekstrom v. State of Wisconsin*, 45 Wis. 2d 218, 222 (1969).

As I observed in my decision on CNH's last motion to dismiss, the plaintiffs could succeed on a claim for breach of the implied duty of good faith only if they were parties to contracts with CNH. And, as I just discussed, the plaintiffs have not plausibly alleged that CNH was a party to the sales contracts that arose when the dealers sold the pickers to the plaintiffs. However, in the second amended complaint, the plaintiffs allege that CNH "maintains that it entered into contracts under which [CNH] agreed to provide parts and repairs to the new Module Express pickers free of charge." Compl. ¶ 102. The plaintiffs allege that, if these contracts existed, then CNH breached the duty of good faith and fair dealing that is implied in the contract by "purposefully and intentionally fail[ing] to produce or procure sufficient amounts of parts critical to the operation of the Module Express pickers from at least 2012 to the present." *Id.* ¶ 106. The plaintiffs generally allege that, because of delays in obtaining replacement parts, they and the proposed class members did not receive timely repairs, which in turn caused them to suffer damages such as the cost of renting replacement equipment during harvest season. *Id.* ¶¶ 105–109.

CNH moves to dismiss this claim for a number of reasons. First, it contends that the plaintiffs have not properly alleged the existence of a contract between CNH and the plaintiffs that created a repair warranty. CNH notes that the plaintiffs first allege that they "have no record of any express warranty documents from [CNH]," *see* Compl. ¶ 64, and then later allege that if an express repair warranty exists, CNH breached it by failing to source replacement parts. CNH contends that this kind of internally inconsistent

17

pleading is not allowed and that, even if it were, the plaintiffs have not properly pleaded their claims in the alternative.

The plaintiffs respond by noting that federal pleading rules allow them to plead alternative and inconsistent claims, which is correct. *See* Fed. R. Civ. P. 8(d)(2)–(3). The plaintiffs could plead a claim for breach of contract and then plead a second claim that will be viable only if the court finds that no contract exists. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003). But the plaintiffs have not pleaded a claim for breach of the duty of good faith as an alternative to another claim that might fail. Instead, they purport to bring the claim as a freestanding one that depends on *the defendant's* proving one of its defenses, namely, that it made an express warranty to the plaintiffs that limited their remedy to repairing defects. As noted, the plaintiffs expressly plead that "they have no record" of any repair contract existing, and the only allegation they make concerning the contract's existence is that CNH has "maintained" that it exists. Compl. ¶ 102. If the plaintiffs were genuinely uncertain whether the contract existed, they could have pleaded some claims that would be viable only if the contract existed and other claims that would viable only if it did not. *See* 5 Arthur R. Miller, et. al, Federal Practice and Procedure § 1283 (noting that, under the Federal Rules, a pleader may "assert contradictory statements when he or she legitimately is in doubt about the factual background of the case or the legal bases that underlie affirmative recovery or defense"). But the fact remains that the plaintiffs have not actually alleged that the repair warranty exists—they do not allege facts indicating how or when the warranty might have been created. They refer only to the defendant's

18

contentions. But CNH will not be called upon to prove its defenses if the complaint does not state a valid claim.

Even if the plaintiffs have adequately alleged the existence of repair contracts, they have not pleaded enough factual matter to enable me to draw the reasonable inference that the defendants breached the implied duty of good faith and fair dealing by failing to make timely repairs. The plaintiffs generally allege that CNH failed to supply or procure sufficient replacement parts for the Module Express pickers and that the unavailability of parts caused delays, which sometimes prevented farmers from using their machines during the short cotton-harvesting season. *See* Compl. ¶¶ 105–06. But the plaintiffs do not allege any facts about their own attempts to obtain repairs. They do not identify any instance in which CNH or its dealer told the plaintiffs that parts were unavailable or needed to be ordered. They do not identify the length of any delay they experienced. They do not indicate the approximate number of times they requested service and were told parts were unavailable. They do not identify any instances in which their machines were inoperable during a harvest season because of CNH's failure to supply replacement parts. In short, the plaintiffs do not allege facts from which I could draw the reasonable inference that CNH was evading the spirit of the plaintiffs' repair warranties by continually failing to supply the parts needed to make promised repairs. Thus, the claim does not survive scrutiny under the *Iqbal/Twombly* standard. For the same reasons, the complaint does not provide "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." *Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir. 2002). The complaint does not identify even a single instance in which the lack of parts caused the plaintiffs to experience what

19

they believe were unreasonable delays, and so CNH is not put on notice of the repair attempts that the plaintiffs are complaining about.

Finally, the plaintiffs have not identified the conduct by CNH that amounted to bad faith. To be sure, the plaintiffs allege that CNH "purposefully and intentionally" failed to procure sufficient parts in an effort to avoid the cost of repairing the defective machines pursuant to its warranty. Compl. ¶¶ 106, 108. But the plaintiffs do not identify the intentional acts that CNH took to restrict the supply of parts. Did CNH halt its own production of replacement parts in bad faith, pay third parties to stop manufacturing parts, or take some other action with intent to make it harder for farmers to benefit from the repair warranty? Without factual allegations showing that CNH somehow manipulated the market for replacement parts, the complaint does not plausibly suggest that it was CNH's bad faith, rather than something innocuous, that caused the lack of replacement parts. *See Twombly*, 550 U.S. at 557 (allegations that are "merely consistent with" unlawful conduct do not state a claim).[8]

For these reasons, the plaintiffs' claims for breach of the implied duty of good faith and fair dealing will be dismissed.

### D.    Unjust Enrichment

The plaintiffs' remaining ground for relief is unjust enrichment. Under Wisconsin law, unjust enrichment requires proof of three elements: (1) a benefit conferred on the

---

[8] The plaintiffs might respond by claiming that these facts are exclusively within CNH's knowledge. However, to have alleged in good faith that CNH acted "purposefully and intentionally" in causing parts to become scarce, the plaintiffs must have conducted an investigation and discovered facts giving rise to a reasonable possibility that CNH manipulated the supply of replacement parts. *See* Fed. R. Civ. P. 11(b)(3). Even if the plaintiffs do not know every last detail about how the scheme unfolded, they must still plead factual matter that makes their claim that such a scheme existed plausible.

defendant by the plaintiff; (2) appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable to do so. *Sands v. Menard*, 379 Wis. 2d 1, 18 (2017).[9]

The plaintiffs do not describe their claim for unjust enrichment in detail, either in their complaint, *see* Compl. ¶¶ 110–13, or in their brief in opposition to CNH's motion to dismiss, *see* Br. in Opp. at 30. But the gist of the claim is that they believe it is unjust for CNH to retain proceeds from the sales of pickers because CNH marketed the pickers as being functional when it knew that they were faulty. As I explained above, the plaintiffs purchased their pickers from CNH's independent dealers rather than from CNH. Thus, it is questionable whether the plaintiffs could be deemed to have conferred a benefit on CNH. If the benefit conferred was payment of the purchase price for the pickers, then the plaintiffs conferred the benefit on CNH's dealers rather than on CNH. *See Emirat AG v. High Point Printing LLC*, 248 F.Supp.3d 911, 937 (E.D. Wis. 2017).

In any event, CNH's retention of any part of the purchase price for the pickers would not be unjust. As other judges in this district have noted, "[u]njust enrichment involves getting something for nothing, not providing a product for a price." *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS, 2019 WL 2774139, at *6 (E.D. Wis. 2019) (quoting *Associated Banc-Corp v. John H. Harland Co.*, No. 06-C-1097, 2007 WL 128337, at *2 (E.D. Wis. Jan. 11, 2007)). A classic example of unjust enrichment is where the plaintiff mistakenly makes improvements to the defendants' property. Under such circumstances, justice may require the defendant to pay the

---

[9] The parties do not raise an issue of choice of law with respect to this claim, and therefore I will apply forum law. *See Wood*, 942 F.2d at 426.

plaintiff for the benefit conferred, even though the defendant did not hire the plaintiff to make the improvements. *Cf. Puttkammer v. Minth*, 83 Wis. 2d 686 (1978). In the present case, the plaintiffs received something in return for the benefit they supposedly conferred on CNH: the Module Express pickers that CNH manufactured. Of course, the plaintiffs allege that the products did not meet their expectations, which they formed after viewing CNH's allegedly deceptive advertising. But the sale of the products were subject to the terms and conditions that the plaintiffs agreed to at the time of sale. If a product did not meet expectations, the plaintiffs were entitled to pursue their contract remedies against their dealers (or against CNH if an express warranty existed). So, even if the products did not meet expectations, the plaintiffs received something in exchange for the benefit they conferred—the products plus the remedies available to them under the contracts they agreed to. They also received whatever remedies might be available to them under applicable deceptive advertising laws. It is not unjust to limit disappointed product purchasers to their legal remedies. *See Weaver*, 2019 WL 2774139, at *6 (recognizing that product purchaser did not unjustly enrich manufacturer by paying for product that is of lower quality than expected).

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendant's motion to dismiss the Second Amended Class Action Complaint (ECF No. 45) is **GRANTED**. The Clerk of Court shall enter final judgment.

22

**IT IS FURTHER ORDERED** that the plaintiffs' motion for a partial stay of discovery and motion practice in the related individual cases pending the resolution of this matter (ECF No. 39) is **DENIED** as **MOOT**.

Dated at Milwaukee, Wisconsin, this 21st day of September, 2020.

s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge